Robert L. Levy (RL-1633)
Amos B. Blackman (AB-7624)
BANTLE & LEVY LLP
817 Broadway
New York, New York 10003
(212) 228-9666
*Attorneys for Plaintiff*

**14 CV        8013**

**JUDGE KARAS**

RECEIVED
OCT 0 , 2014
U.S.D.C. S.D.N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

JOANN BATEMAN,

      Plaintiff,

          - against -

SAC ACQUISITION LLC,

      Defendant.

-------------------------------------------------------------------x

_____ Civ. _____
ECF Case

**COMPLAINT
AND JURY DEMAND**

      Plaintiff JoAnn Bateman, by her attorneys, Bantle & Levy LLP, as and for her complaint against Defendant SAC Acquisition LLC, alleges as follows:

## NATURE OF THE ACTION

    1.    This is an action for employment discrimination based on age and disability, in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. (the "ADEA"), the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 et seq. ("ADA"), and the New York State Executive Law, § 296 et seq. (the "Executive Law"), and for unpaid wages and overtime premium pay owed to Plaintiff JoAnn Bateman and other similarly situated employees of Defendant SAC Acquisition LLC pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA") and Article 19 of the Labor Law of the State of New York ("Labor Law").

2.     Plaintiff brings this lawsuit on behalf of similarly situation current and former employees of Defendant who elect to opt in to this action pursuant to the collective action of the FLSA, 29 U.S.C. § 216(b) to remedy Defendant's violations of the FLSA's wage and hour provisions.

## JURISDICTION AND VENUE

3.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1337, 1343(a)(3) and (4) because Plaintiff's ADEA, ADA, and FLSA claims arise under the laws of the United States, and specifically those protecting civil rights and regulating commerce.  In addition, the Court has supplemental jurisdiction over Plaintiff's claims under the Executive Law and the Labor Law pursuant to 28 U.S.C. § 1367(a) because they arise from a common nucleus of operative fact such that they are so related that they form part of the same case or controversy.

4.     Venue is properly lodged in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the unlawful acts and discriminatory practices alleged herein were committed within the district of the United States District Court for Southern District of New York.

5.     With regard to Plaintiff's claims arising under the ADEA and the ADA, all conditions precedent to jurisdiction under 29 U.S.C. § 626 and 42 U.S.C. §2000e-5(f)(3) have occurred or been complied with:

      a. A charge of employment discrimination on the basis of age and disability was filed by Plaintiff JoAnn Bateman with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the adverse actions of which Bateman complains in this action, on or about January 9, 2014.  The EEOC acknowledged receipt of Bateman's EEOC Charge on or about March 11, 2014, and assigned it EEOC Charge No. 520-2014-00950.

2

b.   The EEOC issued Bateman a notice of suit rights for EEOC Charge No. 520-2014-00950 on or about July 17, 2014.

c.   This Complaint has been filed within 90 days of Bateman's receipt of the notice of suit rights for EEOC Charge No. 520-2014-00950.

## PARTIES

6.   Plaintiff JoAnn Bateman ("Plaintiff" or "Bateman") is a citizen of the United States, and she currently resides in Hawthorne, New York.

7.   Bateman was born on July 26, 1951, and was 62 years old as of August 2013.  For more than the last three decades, Bateman has suffered from acute arthritis in various parts of her body, including her hands and arms.

8.   For at least the past five years, the acute arthritis in Bateman's hands and arms has significantly impaired her manual dexterity and strength, substantially limiting her in such major life activities as performing manual tasks, such as gripping, squeezing and manipulating certain objects, and lifting objects.

9.   Bateman was employed by Defendant SAC Acquisition LLC from on or about May 1, 2012 to on or about October 14, 2013.

10.   Upon information and belief, Defendant SAC Acquisition LLC ("Defendant," "SAC," or the "Company") is a business corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 700 Canal Street, 4th Floor, Stamford, Connecticut 06902.

11.   SAC owns and operates Lovesac, retail furniture stores located throughout the continental United States, including a Lovesac retail store at 125 Westchester Ave, White Plains, New York 10601.

12.     At all times relevant to this complaint, SAC was an employer engaged in industry affecting commerce within the meaning of 29 U.S.C. §§ 203 and 630.

13.     SAC is also a person within the meaning of New York State Executive Law § 292(1), and an employer within the meaning of New York State Executive Law § 292(5) and § 8-107.

## COLLECTIVE ACTION ALLEGATIONS

14.     Plaintiff JoAnn Bateman brings her FLSA claim on behalf of herself and all others similarly situated, pursuant to 29 U.S.C. § 216(b).  Persons similarly situated are those who are and/or were employed by Defendant SAC Acquisition LLC as Design Leads between May 1, 2011 and on or about August 15, 2013 (the "Collective Action Period") within the meaning of 29 U.S.C. § 203(e)(1).

15.     Defendants are liable under the FLSA for, among other things, failing to compensate Plaintiff properly.  Upon information and belief, there are many similarly situated current and former employees of Defendant who have also not been properly paid in violation of the FLSA (the "FLSA Collective"), and who would benefit from the issuance of a court-supervised notice of the instant action and the opportunity to join the instant action.  Those similarly situated persons are known to Defendant, are readily identifiable, and can be located through the use of Defendant's records.  Notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

## INDIVIDUAL FACTUAL ALLEGATIONS

16.     Bateman has suffered from acute arthritis for most of her adult life, including arthritis in her hands and arms.

17.     As a result of the acute arthritis in her hands and arms, Bateman has difficulty performing a variety of manual tasks, including tasks that require gripping, squeezing and manipulating certain objects.

18.     Notwithstanding her acute arthritis, Bateman has enjoyed a successful career in interior design/retail sales for more than fifteen years, including long-term employment with an interior design firm focusing on residential interiors.

The Terms and Conditions of Bateman's Employment at SAC

19.     On or about May 1, 2012, Bateman commenced employment with SAC Acquisition LLC as a "Design Lead" in its Lovesac furniture retail store in Westchester, New York (the "Westchester Store").

20.     SAC and Bateman agreed that Bateman would receive a base salary of approximately $50,000 per annum in exchange for working five 8-hour shifts per week in its Westchester Store.

21.     As a Design Lead, Bateman's primary responsibility was to generate sales of Lovesac products by providing a supportive and informative customer experience, including without limitation, consulting with customers on design options and choices.

22.     In addition, Bateman also shared responsibility for opening and closing the Westchester Store, maintaining the cleanliness and orderliness of the Store's premises and merchandise, and ringing up sales at the cash register, with the other employees of the Westchester Store.

23.     Approximately 1 to 2 times per month, Bateman would provide design consultations at a customer's home.

24.     As a Design Lead, Bateman had no managerial or supervisory responsibilities.

25.     From the inception of her employment until in or about August 15, 2013, the number of hours Bateman was required to work per day varied, with Bateman working an average of 45 or 50 hours per week at various times, and occasionally significantly more hours per week during peak sales seasons.

26.     Upon information and belief, frequently working more than 40 hours per week was typical for Design Leads employed by SAC.

27.     SAC management knew that Bateman was working this amount of hours based on the requirement that non-managerial employees punch in and out, respectively, at the beginning and end of the work day.

28.     Upon information and belief, SAC management knew that working more than forty hours per week was typical for the Design Leads it employed.

29.     SAC paid Bateman on a bi-weekly basis.  Her typical paycheck was for the gross amount of approximately $1935.00.

30.     The gross amount of $1935.00 was payment for 80 hours of work for the two-week period covered by each paycheck, based on the shifts assigned to Bateman.

31.     Electronic paystubs provided to Bateman by SAC identified her pay as "Regular Earnings" and never reflected any pay for overtime.

32.     SAC never paid Bateman for the approximately five to ten hours per week of overtime she worked while employed by the Westchester Store.

33.     On information and belief, during the Collective Action Period, no Design Leads were paid overtime by SAC.

34.     On information and belief, during the Collective Action Period, the responsibilities and work assignments of all SAC Design Leads were substantially the same as those assignments given to Bateman.

35.     According to SAC's job description for the position of Design Lead, the "basic function" of a Design Lead is to be "responsible for establishing, developing and maintaining customer relationships and services.  He/she is responsible for the various tasks involved in the overall operation of a store including maximizing sales/profitability by utilizing design principles to increase sales and develop staff."

36.     According to SAC's job description for the position of Design Lead, the "essential requirements" for a Design Lead are the "ability to process information and merchandise through computer system and POS register system"; the "ability to communicate with HQ, Retail Team, Sac'rs and customers"; the "ability to read, count and write to accurately complete all documentation"; the "ability to freely access all areas of the store including selling floor, stock area, and register area"; the "ability to move or handle merchandise, unassisted, weighing 0-50 pounds"; and the "ability to develop and maintain relationships with customers."

37.     According to SAC's job description for the position of Design Lead, the "principle responsibilities" for a Design Lead are to "ensure that each customer receives outstanding service by providing a friendly environment which includes greeting and acknowledging every customer, maintaining outstanding standards, solid product knowledge and all other components by applying 'common sense and good taste' at all times"; to "support meeting or exceeding budget as identified in annual budget"; to "meet or exceed Personal Sales Goals as identified by Market or Store Manager" and "achieve objectives detailed in Action Plans"; to "provide consultative services to customers and staff regarding space planning, fabric

7

& color coordination, product, selection and overall room design"; to "ensure compliance with all policies and procedures. This includes adhering to the Lovesac dress code, correctly punching in and out, and submitting reports and paperwork as required"; to "develop long term relationships with customers"; and "any other duties as assigned by supervisor."

38.    SAC's job description for the position of Design Lead identifies the "exemption status" of the position as "exempt."

39.    On information and belief, during the Collective Action Period, SAC did not pay Bateman and other Design Leads overtime because it misclassified them as exempt "creative professional" employees.

40.    On information and belief, SAC knew that Bateman and other Design Leads should not be classified as exempt "creative professional" employees because their responsibilities and work assignments were predominantly retail sales and their primary duties were not the performance of work requiring invention, imagination, originality or talent in a recognized professional field of artistic or creative endeavor, as reflected both by SAC's own job description for the position and by the actual work it assigned its employees.

Bateman's Performance at SAC

41.    As a Design Lead, Bateman was supervised by the Westchester Store's General Manager.

42.    When Bateman commenced employment at SAC, the General Manager of the Westchester Store was Marlene Brown.

43.    As Bateman's supervisor, Brown was the SAC employee responsible for giving Bateman feedback on her performance.

44.     Brown never gave Bateman any negative performance evaluations or performance warnings, or any employee discipline for misconduct or under-performance.

45.     On a number of occasions, however, Brown made comments reflecting her opinion that as a woman over 60, Bateman did not fit the image of a Lovesac, including remarking to Bateman, "You should wear Depends."

46.     On a small number of occasions during her employment with SAC, Bateman was asked to physically assemble Lovesac furniture in the Westchester Store or at customer's home.

47.     Due to her acute arthritis, however, Bateman was not physically able to connect the bracket clamps of certain Lovesac modular sofas.

48.     In or about the first weeks of her employment, Bateman informed her then-supervisor, Brown, that acute arthritis in her hand and fingers prevented her from completing the task of assembling a Lovesac modular sofa using bracket clamps without assistance.

49.     Brown told Bateman that she had discussed the matter with SAC management and that the Company did not consider her inability to independently assemble the modular sofa requiring bracket clamps to be a performance issue.

50.     Brown further told Bateman that SAC would provide her with assistance with the bracket clamps as a "reasonable accommodation" for her arthritis whenever necessary.

51.     This providing staff assistance to Bateman when in-store sofa assembly was required using the bracket clamps and sending a second SAC employee with Bateman on so-called White Glove Service assignments requiring sofa assembly at customer's homes.

52.     Brown continued to supervise Bateman for approximately 8 months, during which time she honored this accommodation on the rare occasions the issue arose.

9

53.   In or about January 2013, June Barlow replaced Brown as General Manager of the Westchester Store and assumed the role of Bateman's supervisor.

54.   Barlow supervised Bateman for approximately 7 months, until August 2013.

55.   During this time, Barlow continued to honor the accommodation of providing Bateman with assembly assistance on those occasions Bateman was asked to assemble a modular sofa that required using of the bracket clamps.

56.   During this time, Barlow never gave Bateman any negative performance evaluations or performance warnings, or any employee discipline for misconduct or under-performance.

57.   In or about August 2013, Ryan Welker replaced Barlow as General Manager of the Westchester Store and assumed the role of Bateman's direct supervisor.

58.   Prior to becoming General Manager of the Westchester Store, Welker had managed other Lovesac stores around the United States.

59.   Through his words and actions, Welker quickly made it clear that he believed that Bateman was too old to be a Lovesac salesperson and designer and did not fit the Company's youthful image.

60.   Welker constantly made comments reflecting his desire to have a young, hip sales team that he believed reflected Lovesac's youthful and hip brand identity.

61.   Among other things, Welker frequently referred to Lovesac as a "young person's company," and stated a preference for employees with whom he could "grow old together."

62.   On or about August 15, 2013, Welker advised Bateman that he was aware that she and other in-store personnel had been routinely working more than 8 hours per day and 40 hours per week.

63.     Welker further advised Bateman that SAC had determined that this practice was problematic and had decided that in-store personnel were now required to work no more than 8 hours per day unless they received express authorization for additional hours.

SAC's Termination of Bateman

64.     On or about Friday, October 11, 2013, Welker directed Bateman to supervise the delivery of the base of Lovesac a modular sofa to a customer's home.

65.     Although the usual practice was to have two Company employees participate in deliveries of this kind, without further explanation Welker directed Bateman to handle this delivery on her own.

66.     When Bateman arrived at the customer's home, the customer requested assistance attaching the newly delivered base to several other bases already in her home, which required putting on new bracket clamps.

67.     As a result of her arthritis, Bateman was not capable of successfully assisting the customer with this task.

68.     When Bateman returned to the Westchester Store, she promptly reported both the customer's request for assembly assistance to Welker and her inability to complete that assembly, and requested that arrangements promptly be made to assist the customer.

69.     Welker became upset and questioned Bateman extensively about her inability to complete the assembly.

70.     Bateman explained that she was physically unable to independently attach the sofa's new bracket clamps due to her disabling arthritis.

71.    Bateman also explained that in circumstances where sofa assembly using new bracket clamps previously had been required of her, SAC had provided assembly assistance as an accommodation of her arthritis.

72.    Under Welker's intensive and forceful questioning, Bateman also disclosed to Welker that she recently had "a battery of medical tests" for a variety of ongoing medical issues, including, but not limited to, her arthritis.

73.    Welker advised Bateman that she would be disciplined for her failure to complete assembly of the customer's sofa and that in the future she would be responsible for completing that task without accommodation.

74.    Notwithstanding that accommodating Bateman's disabling arthritic placed no more than a *de minimus* burden on SAC, Welker did not explain why SAC was now unwilling to provide Bateman an accommodation for her arthritis.

75.    Welker did not propose an alternative reasonable accommodation or otherwise engage Bateman in an interactive process regarding her need for an accommodation, nor did anyone else at SAC.

76.    As reflected both by SAC's own job description for the position of Design Lead – which did not include any reference to assembling Lovesac sofas using the modular sofa bracket clamps – and by the actual work it assigned Bateman, sofa assembly was not one of the essential functions of Bateman's job.

77.    Rather, Bateman's essential job functions were to promote retail sales and provide a positive customer experience to Lovesac's customers.

78.    Three days later, on Monday, October 14, 2013, Welker informed Bateman that her employment with SAC was being terminated effective immediately.

79.     On information and belief, Welker had personally requested Bateman's termination.

80.     When Bateman requested an explanation for the termination, Welker would not provide an explanation, instead directing her to speak with SAC Human Resources representative Susan Mendillo.

81.     Bateman spoke to Mendillo via telephone later that week and requested an explanation for the termination.

82.     Mendillo told Bateman that she had been terminated due to "performance issues" that allegedly "came to a head last week" when she could not assemble the bracket clamps alone at the customer's home, but declined to specify the nature of those performance issues.

83.     Months later, after learning of Bateman's allegation of discrimination, SAC purported to change its justification for Bateman's termination to "insubordination."

84.     Prior to her termination, neither Welker, nor any other manager at SAC had disciplined Bateman or given her a negative performance review based on either poor performance or insubordination.

85.     The suddenly-discovered alleged performance issues, and the allegation of insubordination, were pretext for discrimination.

86.     Upon information and belief, Bateman's disabling arthritis was a motivating factor in SAC's decision to terminate her employment.

87.     Upon information and belief, Bateman's continuing request for a reasonable accommodation for her disability was also a motivating factor in SAC's decision to terminate her employment.

88.     Further, on information and belief, but for Bateman's age, SAC would not have terminated her employment.

89.     As a result of Defendant's discriminatory termination of her employment, Bateman was denied income and benefits, continuing opportunities for promotion, advancement, recognition, and increased compensation, she would have received had she not been terminated.

90.     As a result of Defendant's discriminatory termination of her employment, Bateman has further sustained severe mental and emotional harm and distress.

## FIRST CAUSE OF ACTION

### *Overtime Wages Pursuant to the FLSA, 29 U.S.C. § 201 et seq.*

91.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

92.     At all times relevant to her claims, Defendant was the employer of Plaintiff and persons similarly situated to her, and Plaintiff and persons similarly situated to her were employees of Defendant within the meaning of the FLSA. 29 U.S.C. § 203(d) & (e).

93.     At all times relevant to her claims, Plaintiff and persons similarly situated to her was employed by Defendant in an enterprise engaged in commerce with annual gross volumes of sales of not less than $500,000 within the meaning of the FLSA. 29 U.S.C. § 203(s)(1).

94.     Plaintiff and persons similarly situated to her frequently worked over forty (40) hours per work week.

95.     Defendant failed to pay Plaintiff and persons similarly situated to her overtime compensation at a rate of not less than one and one-half (1 ½) times their regular rate of pay for each hour of work over forty (40) hours per week in violation of the FLSA. 29 U.S.C. § 207(a)(1).

96.    Defendant had no reasonable grounds for believing its failure to pay Plaintiff and persons similarly situated to her overtime compensation was not a violation of the FLSA. Defendant's failure to pay them overtime compensation was willful and not in good faith.

97.    Plaintiff and persons similarly situated to her have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### *Overtime Wages Pursuant to the New York Labor Law*

98.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

99.    At all times relevant to her claims, Defendant was the employer of Plaintiff and Plaintiff was an employee of Defendant within the meaning of the NYLL. § 651(5) & (6).

100.    Plaintiff frequently worked over forty (40) hours per work week.

101.    Defendant failed to pay Plaintiff overtime compensation at a rate of one and one-half (1 ½) times Plaintiff's regular rate of pay for each hour of work over forty (40) hours per week in violation of Article 19 of the NYLL and the implementing regulations of the New York State Department of Labor. NYLL § 650 *et seq.*; 12 NYCRR 142-2.2.

102.    Defendant had no reasonable grounds for believing its failure to pay Plaintiff overtime compensation was not a violation of the NYLL.  Defendant's failure to pay Plaintiff overtime compensation was willful and not in good faith.

103.    Plaintiff has been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

#### *Discrimination on the Basis of Plaintiff's Disability under the ADA*

104.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.     As a result of Defendant's aforesaid acts, Defendant discriminated against Plaintiff on account of her disability in violation of the in the Americans with Disabilities Act, as amended, when Defendant terminated her employment.

106.     As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

### FOURTH CAUSE OF ACTION

#### *Discrimination on the Basis of Plaintiff's Age under the ADEA*

107.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

108.     As a result of Defendant's aforesaid acts, Defendant discriminated against Plaintiff because of her age in violation of the in the Americans Discrimination in Employment Act, as amended, when Defendant terminated her employment.

109.     As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## FIFTH CAUSE OF ACTION

### *Discrimination on the Basis of Plaintiff's Disability under the Executive Law*

110.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

111.    As a result of Defendant's aforesaid acts, Defendant discriminated against Plaintiff on account of her disability in violation of the in the New York State Executive Law when Defendant terminated her employment.

112.    As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## SIXTH CAUSE OF ACTION

### *Discrimination on the Basis of Plaintiff's Age under the Executive Law*

113.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

114.    As a result of Defendant's aforesaid acts, Defendant discriminated against Plaintiff on account of her age in violation of the in the New York State Executive Law when Defendant terminated her employment.

115.    As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

17

WHEREFORE, Plaintiff respectfully requests that this court enter a judgment:

(1)    Authorizing notice of this action pursuant to 29 U.S.C. § 216(b);

(2)    Declaring that the acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq., the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 et seq., the New York State Executive Law, § 296 et seq., and the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.;

(3)    Restraining and enjoining Defendant from engaging in further conduct violating the rights of Plaintiff and such persons as may opt in to this action;

(4)    Directing Defendant to pay Plaintiff and such persons as may opt in to this action damages in the form of unpaid overtime as provided for by the FLSA, in an amount to be shown at trial;

(5)    Directing Defendant to pay Plaintiff and such persons as may opt in to this action liquidated damages as provided for by the FLSA, in an amount to be shown at trial;

(6)    Directing Defendant to pay Plaintiff liquidated damages as provided for by the New York Law, in an amount to be shown at trial;

(7)    Awarding Plaintiff damages in the form of (a) back-pay with interest based on Plaintiff's appropriate lost income had she not been discriminated against; (b) front-pay; and (c) reimbursement for lost opportunities and other benefits, in an amount to be shown at trial;

(8)    Awarding Plaintiff compensatory damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial, but believed to exceed $500,000;

(9)     Awarding Plaintiff punitive damages in an amount not less than $500,000;

(10)    Awarding Plaintiff the costs of this action together with reasonable attorneys' fees;

(11)    Awarding Plaintiff interest; and

(12)    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demands trial by jury.

Dated: October 2, 2014
       New York, New York

                          BANTLE & LEVY LLP

                          Robert L. Levy (RL-1633)
                          Amos B. Blackman (AB-7624)
                          817 Broadway
                          New York, NY 10003
                          (212) 228-9666
                          *Attorneys for Plaintiff*